IN RE CONNOLLY'S ESTATE.  FLANAGAN, EXECUTOR, ET
AL., APPELLANTS, v. CONNOLLY ET AL., RESPONDENTS.

(No. 5,602.)

(Submitted January 14, 1925.  Decided April 1, 1925.)

[235 Pac. 408.]

*Executors and Administrators—Duties and Powers—Settlement
of Accounts—Personal Indebtedness to Estate—Failure to
Pay—Extent of Liability—Exoneration—Objections to Ac-
count — Estoppel — Attorneys' Fees — Disallowance—When
Error.*

Executors and Administrators — Settlement of Accounts — Attorney's
Fees—Attorney not Entitled to Appeal.
    1. On an executor's appeal from an order settling his account
which *inter alia* disallowed credit to the executor for the fees
paid his attorney, the latter, though indirectly interested in the
outcome of the appeal, not having been a party to the proceedings,
was not entitled to join in the appeal.
Same—Appeal—Amendments to Objections to Account After Submis-
sion of Cause to Trial Court Improper Practice—Harmless Error.
    2. While the practice of permitting amendments to objections to
an executor's account after the cause had been submitted to the
court for decision is not approved, in view of the fact that the
court was bound to consider the matters therein presented, no
prejudice to appellant could have resulted therefrom.
Same—Loaning Estate Funds Without Approval by Court—Liability
for Losses.
    3. An executor or administrator who makes loans of estate funds
without authority of court (sec. 10396, Rev. Codes 1921) does so
at the peril of being held liable for losses sustained by the estate;
whereas if the course prescribed by the statute is pursued he
will be relieved of liability upon a showing that the loss was not
occasioned by his own fault.
Same—Measure of Liability for Losses on Unauthorized Loans.
    4. Where an executor makes loans of estate funds without ap-
proval of the court and loss is sustained, the amount properly
chargeable to him is the difference between the amount collected
and the amount invested.
Same—Extent of Authority—Persons Dealing With Executor Bound
to Take Notice.
    5. *Obiter:* A person dealing with an executor or administrator as
such is bound to take notice of the authority of the court to con-
trol such dealings as are within its jurisdiction, and if the ac-

_____

    3. Right of fiduciary to make investments beyond jurisdiction of
appointing court, see note in 14 Ann. Cas. 834.

tions of the executor are not authorized, such person must be prepared to place the estate in the position it was in when the dealings were commenced.

Same—Executor as Debtor of Testator—Partial Payments on Debt—Refusal of Credit Error.

6. An executor who was indebted to testator at the time of the latter's death was entitled to credit on settlement of his account for partial payments made by him while acting in his representative capacity, and the holding of the trial court that payments on account could not be made under section 10133, Revised Codes of 1921, since thereunder the executor was liable for the whole debt as for money in his hands and that the payments made were mere voluntary contributions, was error.

Same—Executor Indebted to Estate—Liability as for Money in Hand—Statute—Construction.

7. Construing section 10133, Revised Codes of 1921, which provides that an executor who was indebted to his testator at the time of the latter's death is liable for the amount owing as for money in his hands when the debt becomes due, *held* that the statute merely abrogates the common-law rule whereby the bare appointment of an executor operated to extinguish any debt due from the executor to testator.

Same—Rule of Liability upon Personal Debt to Estate.

8. The rule of liability of an executor upon his personal debt due the testator differs in nowise from the rule as to administrators upon debts due from them to decedents.

Same.

9. Neither an executor nor an administrator is liable in his representative capacity upon any debt due his decedent as for money in hand, where during the progress of administration he had no means from which the debt could have been paid.

Same.

10. Where during the course of administration of an estate a person who is an executor and debtor to his testator pays to himself as executor upon his personal debt all he has the ability to pay, there is no liability on his part as executor for the balance remaining unpaid.

Same—Failure to Pay Personal Debt—Burden of Proof.

11. On settlement of his account, an executor who at the time of his testator's death was indebted to the latter, has the burden of showing that he has paid all he can on the debt due the estate.

Same—Failure to Pay Personal Debt—Exoneration from Liability—Effect.

12. Exoneration of an executor from liability in his representative capacity for failure to collect or pay a debt due from him per-

6. Effect of appointment of debtor as executor or administrator to discharge debt, or charge personal representative and his sureties, see note in 26 L. R. A. (n. s.) 411.

Bond of executor or administrator as covering debt due from principal to decedent, see note in 8 A. L. R. 84.

8. Liability of executor or administrator for own debt due decedent, see note in 112 Am. St. Rep. 406.

9. Liability of administrator and his sureties for debt of former to estate, administrator being insolvent, see note in 61 L. R. A. 313.

[73 Mont. 35.]

sonally to his testator does not extinguish the debt, which should be distributed to those entitled to the same as all other assets of the estate on hand at the time of its distribution.

Same—Accounts—Contents.

13. The account of an executor when presented to the court for settlement should disclose the condition of the estate by a system of charges and credits claimed, and advise the court as to what of the assets are on hand and what has been done with those which are not on hand.

Same—Settlement of Account—Objections—Estoppel.

14. If the doctrine of estoppel may ever be applied in probate proceedings (settlement of an executor's account), it must appear that every person interested in the estate would be bound before the court would be warranted in relieving an executor from liability to everyone by reason of the existence of a state of facts justifying its application.

Same—Attorneys' Fees—Disallowance—When Error.

15. It is only in extreme cases where an executor is not entitled to credit in some amount for fees paid to his attorney; therefore where the executor was not permitted to make any showing whatever in that regard, the court erred in disallowing the item of fees.

*Appeal from District Court, Chouteau County; John W. Tattan, Judge.*

In the Matter of the estate of Martin Connolly, deceased. From an order settling account of F. A. Flanagan, the executor, on objections by Catherine L. Connolly and others, executor and his attorney appeal. Reversed and remanded, with directions as to executor, and appeal of attorney dismissed.

*Messrs. Miller & Wiley* and *Messrs. Gunn, Rasch & Hall,* for Appellants, submitted a brief; *Mr. Carl Rasch* and *Mr. C. W. Wiley* argued the cause orally.

*Messrs. Stranahan, Towner & Lynch,* for Respondents, submitted a brief; *Mr. F. E. Stranahan* argued the cause orally.

(Note.—The authorities cited by counsel may be found in the opinion and are therefore not re-cited here.)

15. Power of administrator to make estate liable for attorney's fees, see note in 93 **Am. Dec.** 393.

HONORABLE LYMAN H. BENNETT, District Judge, sitting in place of MR. JUSTICE GALEN, absent on account of illness, delivered the opinion of the court.

Some time prior to June 1, 1917, Martin Connolly died testate, leaving all his property to his wife, Catherine L. Connolly, and his daughters, Aaileen and Mary, to be divided equally when the daughter Mary reached the age of twenty-five years. At some time before the contest involved herein arose the daughter Aaileen was married to a man named Swanson. On June 1, 1917, the will having been admitted to probate by the district court for Chouteau county, letters testamentary were issued to the executors named therein, namely, Frank A. Flanagan and Catherine L. Connolly. On September 25, 1917, the executors filed their inventory of the estate having come to their hands. The inventory shows, among the various items, one of "notes secured and unsecured, $42,556." The record discloses that at the time of Martin Connolly's death there was a considerable amount of cash on hand, and that that sum was augmented from time to time by cash received through payments of principal and interest upon notes owing to the decedent, and from other sources. Included in the cash received upon notes were sums paid by Mr. Flanagan personally on account of indebtedness which he owed Mr. Connolly at the time of his death.

From the time of their qualification down to the first day of January, 1923, the executors handled something in excess of $70,000 in cash. At different times during the period just named one executor or the other loaned portions of the estate moneys to various persons. One loan was made to Catherine L. Connolly individually. That loan was promptly repaid. No order of court authorizing any of the loans made by either of the executors was ever obtained. On February 26, 1923, the executors filed a joint account of their transactions from the date of their qualification to the first day of January, 1923. Except for reports filed as supplemental thereto, this was the

only account ever filed, and it will be termed the account. Apparently the court fixed a time for hearing the account and caused notice to be given, for the court minutes show that on March 12, 1923, the account came on for hearing; F. A. Flanagan was sworn and examined; and the matter was taken under advisement. Thereafter, and before any order settling the account was made, the executors fell into an open disagreement. By various petitions and motions Catherine L. Connolly sought to be exonerated from having presented the account in the form in which it was filed, and to have the loans of estate funds, which she claimed were made by Mr. Flanagan alone, charged to him. The first attack was the filing by Mrs. Connolly of a petition for Mr. Flanagan's removal from the executorship. The petition was based upon a loan to a concern known as the O'Hanlon Land & Stock Company, amounting to the sum of $10,333. Mr. Flanagan thereupon attempted to resign. The resignation was not at that time accepted. Later Mrs. Connolly and her daughters filed objections to the account, directed at the O'Hanlon loan and three other loans, all of which it was claimed were made by Mr. Flanagan without consulting Mrs. Connolly. These objections were that the loans were made without first having been authorized by the court. On the same day on which these objections were filed Mrs. Connolly filed her petition seeking relief from having joined in the account filed February 25, 1923. Various steps were taken thereafter, including a hearing held June 23, 1923, at which time testimony was taken. In supplemental statements filed by both Mrs. Connolly and Mr. Flanagan before the hearing of June 23, it appeared that Mr. H. F. Miller, the attorney who had represented the executors, had been paid $1,013.90. The testimony disclosed that this was part payment of fees for services and for certain expenditures made by Mr. Miller.

At the hearing of June 23 there was considerable examination of Mr. Flanagan and others as to what services Mr. Miller had performed. An offer was made to place the attorney on the witness-stand for examination concerning all matters, and

particularly the matter of his fees and the services rendered by him. This the court declined to permit, ruling, "It is not necessary at this time." At this same hearing counsel also sought to examine Mr. Flanagan as to the security on the loans which had been objected to. This the court also refused to examine into.

In September, 1923, the court accepted the resignation of Mr. Flanagan as executor. Thereafter, and on March 13, 1924, Mrs. Connolly and her daughters filed a motion, asking leave to file amendments to the objections which had heretofore been filed to the account. The nature of the proposed amendments was to assert that under the statutes Mr. Flanagan became, upon accepting the executorship, liable for the amount of his indebtedness to the decedent as money in hand, and that the amount of the payments made thereon after the appointment could not be considered; that is, that installment payments of such indebtedness could not be accepted, and that Mr. Flanagan should not be entitled to any credit for such payments as he had made. This motion was set down for argument and on March 17, 1924, an order was made taking the motion under advisement, but giving the attorneys time to file briefs. Thereafter, and before any ruling had been made upon the last motion, the court on May 8, 1924, entered an order settling the account. It should also be stated that, without much detail, the account disclosed all loans made by either executor, including those specifically referred to above, and one other, which it appears was made at the suggestion of Mrs. Connolly. The account and supplemental accounts also listed payments on all loans which had been made by the executors. By the order settling the account the executors were disallowed credit for any portion of the five loans made by them. They were likewise disallowed credit for the payment to the attorney, Mr. Miller. It was ordered that Mr. Flanagan be charged with the entire amount of his indebtedness to Mr. Connolly in his lifetime "as and for so much money in his hands." No credit was allowed for any payment by Mr. Flanagan upon his indebtedness. After

the order settling the account was entered, Mr. Flanagan moved for a new trial upon the account, which was denied. In support of the motion for a new trial, the affidavits presented asserted that included in the lump sum of notes due as listed in the inventory amounting to $42,556 were Mr. Flanagan's personal notes.

After the motion for new trial was denied, an appeal was taken to this court by Mr. Flanagan. This appeal was joined in by Mr. Miller, the attorney. After the appeal was taken, Catherine L. Connolly died. That fact being suggested to this court upon the oral argument of the appeal for the first time, it was ordered that her personal representatives, when appointed, be substituted herein, in her place and stead.

Before going forward with the discussion of the questions [1] which are raised by Mr. Flanagan's appeal, we will point out that, notwithstanding the fact that Mr. Miller may be indirectly interested in the outcome of this appeal, he is not so interested in the matter as to give him a right to appeal. He was never a party to any of the matters before the lower court. The question of his fees was not raised by any proceeding instituted by himself on his own behalf. He is in fact a stranger to the proceedings, except as he appears for Mr. Flanagan. The order as made, and from which the appeal was taken, could not be considered as an adjudication of his right to compensation. It might be true that, if he should now take such steps as may be open to him by section 9786, Revised Codes of 1921, as that section has been construed by this court in the case *In re McLure's Estate,* 68 Mont. 556, 220 Pac. 527, he might be bound, if it could be said that he acquiesced in the order disallowing the executor's claim of credit for the amount. It may be inferable from the present record that the court was not disposed to make any allowance for attorney's fees had Mr. Miller made application to have such fees fixed, but that question is not presented. It is our view that, with reference to the attorney's fees, the only question before the court was whether or not the executors were entitled to credit for the amount paid

Mr. Miller, and he is not bound by the lower court's ruling. On the other hand, we point out that, as concerns the executors, section 9786, *supra,* does not for a moment assume to prevent them from asking and receiving credit for proper attorney's fees which have been paid by them, or for which they have incurred a liability. That section merely gives to the attorney, who had rendered services for an executor or administrator and cannot agree with his client as to the amount of compensation, a proceeding by which he can have his fees fixed so as to hold the estate liable therefor.

We will not set out the various assignments of error, but will content ourselves with a discussion of the questions presented thereby.

Considerable stress is laid by appellant upon the proposition [2] that, since no objections were made or filed by any one prior to the day upon which the account first came on for hearing and the day it was taken under advisement, the respondents should never have been heard to object. While we do not approve of the practice which was resorted to in this case, to-wit, of filing objections and amendments after the matter was apparently taken up for consideration and closed, we are not in a position to say that prejudicial error was committed by the court in permitting the practice. Upon the filing of the account it became the duty of the lower court to examine the same carefully and to disallow any items for which credit could not properly be given. In making this statement we are merely asserting that, as a general proposition, and barring some other questions which will be taken up later, it is the court's duty, regardless of objections, to examine accounts and disallow improper items for which credit is asked. The matters which were relied upon by the order of May 8, 1924, were all such as it was the duty of the lower court to look into, even in the absence of objections, provided full opportunity had been given to the executors to be heard. As to whether the rulings were correct, we shall see presently.

[73 Mont. 35.]

Taking up first the question of the order as to the various [3] loans made by the executors without first having been authorized so to act, we call attention to the fact that it is very dangerous practice for one acting in a representative capacity to handle the assets which are in his hands as they were handled in this instance. The statute controlling the power of executors and administrators to invest estate funds (sec. 10306, Rev. Codes 1921) was intended to prevent this very character of action. An executor or administrator who, without having proceeded regularly, assumes to act upon matters which are required by the statute to be done only pursuant to orders of court, is in a position where, if any loss to the estate results, he will be held liable, regardless of his other efforts to protect the estate; whereas, if proceedings are regularly taken to secure the authorization of the court in advance of actual steps being taken, the extent of the liability is that the representative may show that the loss was not occasioned by his own fault. If this showing is made, he will not be held liable for such loss.

However that may be, we are confronted in this matter with [4] a situation which discloses that the estate funds had been invested without compliance with the statute. The effect of the trial court's order thereupon was to determine that the loans which were made were not estate loans, and to substitute for estate assets the personal liability of the executors for the cash which had been invested by lending to various borrowers. If the indebtedness which thus arose is not an estate asset, then it is the individual asset of the executors. Let us assume a condition of affairs, which we have no means of knowing does not obtain herein, from which it would be found that the executors' bonds were executed by personal sureties; that, by reason of conditions over which the court had no control, the sureties, who, at the time of the execution of the bond, were entirely sufficient, have become insolvent; that the executors themselves are insolvent, are heavily indebted and the other creditors of the executors undertake to realize

on their claims by attaching the indebtedness which the court has said are the personal assets of the executors. The result would be that the estate would suffer loss of many thousands of dollars. We cannot bring ourselves to the point where we can conceive that such is the correct result. Without assuming to approve the actions of the executors in this regard, which in our opinion would have warranted the trial court in withholding its approval of their acts, and in directing an immediate collection of the indebtedness due the estate, or, pursuant to the provisions of sections 10124 *et seq.*, Revised Codes of 1921, a removal of the executors who had mismanaged the estate, we cannot conclude that any order made by the court in a probate matter is correct which would have any such possible result as the one we have indicated.

Bearing in mind that the funds invested were estate funds, the entire amount which could be collected would belong to the estate, and this is so without regard to the question whether the investment was of a character which is permitted by section 10306, *supra,* or whether the steps had been taken as therein provided to secure the authority to invest. The amount or amounts with which the executors would be properly and finally chargeable as a result of such transactions would be the difference between the amount collected and the amount invested.

With reference to the question of immediate collection of [5] the funds invested, it might be observed properly that a person who deals with an executor or administrator, as such, is bound to take notice of the authority of the court to control such dealings as are within its jurisdiction, and, if the actions of the executor or administrator are not authorized, the person so dealing must be prepared to immediately place the estate in the same position it was when the transactions were commenced.

It might be argued that, following the rule which has been repeatedly announced in this state and was applied in the case of *Lamont* v. *Vinger,* 61 Mont. 530, 202 Pac. 769, if the

steps looking to the authorization were not taken as required by section 10306, *supra,* the court would be without jurisdiction to ever approve any investments made by executors or administrators. The rule of *Lamont* v. *Vinger, supra,* has no application to this character of question. That case held that, since the title to the property of a decedent vested in the heirs immediately upon death, subject only to the possession of the representative and the control of the court for purposes of administration, any steps which resulted in or contemplated the result of divesting the heirs of their title, would have to be, of necessity, based upon due process, and that failure to comply with the statutory provisions would render any sale of estate property void. Section 10306, on the other hand, clearly contemplates that the persons entitled to share in the distribution of the estate cannot be compelled to accept in lieu of the property of the estate any security which is the result of investment of estate funds, since the language of the statute is to the effect that investments may only be made pending settlement. We can therefore see no reason why, if all the facts which are contemplated by section 10306 are shown to exist, upon the filing of an account and the hearing thereon, a court sitting in probate cannot, at the time of settlement of accounts, approve loans which have been made and relieve executors or administrators from any greater degree of care than obtains with reference to all other classes of assets.

It is our conclusion that section 10306 should be read and considered in the light of sections 10283 and 10284, Revised Codes of 1921, which provide that representatives shall not be liable for losses occurring without their fault, and that its effect is merely to fix a liability on the executor or administrator for all invested funds which remain uncollected at the time of final settlement, where the provisions of section 10306 have not been complied with, regardless of the degree of care which had been taken to collect, and, on the other hand, to relieve the representative from any greater liability

than obtains relative to all assets where the statute has been followed touching investments.

It is evident, without any argument upon the subject, that the trial court erred in refusing to credit the executors with the amounts which had been paid upon the loans, and, upon reason, we are equally as certain that it was error to disallow credit upon any of the loans which remained uncollected without first ascertaining that the estate has or will suffer loss by reason of the transactions. In event there were a loss, the liability would only be for such an amount as would make the estate whole.

The next questions which require serious consideration are [6] the rulings upon the account, by which the court refused credit for the payments made by Mr. Flanagan upon his personal indebtedness while acting as executor, and charged the entire amount of that indebtedness to him as "money in his hands."

As to the first of these questions, it appears that the trial court relied upon the provisions of section 10133, Revised Codes of 1921, which reads as follows: "The naming of a person as executor does not thereby discharge him from any just claim which the testator has against him, but the claim must be included in the inventory, and the executor is liable for the same, as for such money in his hands, when the debt or demand becomes due," and held that payments on account could not be made, evidently taking the position that such were mere voluntary contributions. It would seem to be apparent that such a position is untenable. Granting, for sake of argument, that the statute is susceptible of -the construction that such a debt is always chargeable as money in hand, certainly, when any portion of the money due does actually come to the hands of the executor as such, from application of partial payments, a court cannot ignore the cash which has been received and hold the executor for the full amount of the original indebtedness. Beyond any question the ruling disallowing credit for such payments was erroneous. If there

was any doubt in the court's mind as to the exact amounts due, or the amounts paid, it was its duty to clear the matter up and definitely ascertain what had been paid, and to allow credit for all money which was on hand.

As to the ruling touching the liability of the executor upon [7–13]  his entire indebtedness as for "such money in his hands," a more serious question is presented. In this connection it should be borne in mind that Mr. Flanagan's resignation as executor has been accepted by the court and the letters testamentary issued to him revoked. Without passing upon the effect of the orders last referred to, it is evident that, if they are valid, the settlement of the account should fix the exact liability of Mr. Flanagan to the estate. If the ruling upon the question now under consideration was correct, then Mr. Flanagan is bound to turn over in cash to the present executor or administrator *de bonis non* the full amount of the indebtedness which he owed Mr. Connolly at the time of his death.

It should be noted in the discussion which will follow that we are ignoring any complication of the question under consideration which might be occasioned by the fact that there were joint executors, and are attempting to resolve the situation as though Mr. Flanagan had been the sole executor.

We point out further that, except as it throws light upon the question under consideration, we are not considering the question of the ultimate liability of Mr. Flanagan's bondsmen, as that is not directly involved herein.

The question presented by this situation is: What is the rule in this state as to the extent of the liability of an executor, as such, of the will of a decedent, upon or with reference to an indebtedness which at the time of the testator's death was owing from the person named as representative to the decedent? The correct answer to this question necessarily depends to a large extent upon the meaning of section 10133, *supra.*

This exact question is one of first impression in Montana. It is true that reference has heretofore been made to this statute by this court. As recently as the case of *In re Rodgers' Estate*, 68 Mont. 46, 217 Pac. 678, the court said: "When Thomas qualified as executor the sale price of the cattle was due from him, and he immediately became liable therefor as for money in his hands by section 10133, Revised Codes of 1921." This case does not bear directly on the point under consideration. Later on, however, we will take it up for the purpose of showing that it is entirely in harmony with our present views.

An examination of the decisions of the courts of other states upon this question, discloses much conflict of opinion. The commentators classify the authorities as following the minority, which they have designated the "Massachusetts rule," and what they term the "majority rule."

On certain phases of the rule, however, there appears to be almost no diversity. For instance, no decision has been found which does not hold both executors and administrators alike liable in their representative capacities upon or for the amount of admitted indebtedness due from them personally to their decedent as for such money in their hands, where it appears that such representatives are, or were, personally possessed of assets from the proceeds of which they could have actually realized the cash for which they were held liable. It is upon the rule of liability which is applicable to a situation where the representative has no personal means with which to meet the indebtedness which he owed his decedent that the courts have divided. The most usual presentation of the disputed rule occurs in the cases where attempts have been made to hold the representative's bondsmen liable for the debt due a decedent from a personally insolvent executor or administrator. The application of the Massachusetts rule always results in the holding of the bondsmen liable. The apparent majority rule would only hold the sureties liable where the representative had failed to use that degree of care to preserve the

assets of his decedent for distribution to the persons entitled
thereto, which is required of him toward other debts due
his decedent. Generally, with the exception of California, the
rule with reference to executors and administrators has been
found to be the same. The notes to the cases of *Wachsmuth*
v. *Penn Mutual Life Ins. Co.* (241 Ill. 409, 132 Am. St. Rep. 226,
89 N. E. 787), as reported in 26 L. R. A. (n. s.) 411, and
*State ex rel. Farmer* v. *Citizens' Trust & Guaranty Co.* (84
W. Va. 729, 100 S. E. 685), found in 8 A. L. R. 79, cite a
large number of authorities on both sides of the question.

In the light of the fact that the rule has never been an-
nounced for Montana, after considering the apparent con-
trariety of opinion, we will make something more than a
casual statement of our views as to the history of the rule.

The most concise statement of the general rule, we have
found, appears in *Warner* v. *Knower*, 3 Dem. Sur. (N. Y.)
208. There the court said: "It is a familiar legal doctrine,
\* \* \* when the same person is bound to pay money in
one capacity, and to recover it in another, the law presumes
that he has done what it was his duty and in his power to
do, and holds him chargeable, as if it had been actually done."
This general rule has universally been applied to administra-
tors of the estates of decedents, where the conditions did not
warrant a finding that they had not been guilty of negligence
in their handling of the assets with which they were charge-
able. In some instances it has been applied regardless of
that consideration. (See *Stevens* v. *Gaylord*, 11 Mass. 256,
*Harker* v. *Irick*, 10 N. J. Eq. 269; *Arnold* v. *Arnold*, 124
Ala. 550, 82 Am. St. Rep. 199, 27 South. 465; *Estate of Walker*,
125 Cal. 242, 73 Am. St. Rep. 40, 57 Pac. 991; *Sanders* v.
*Dodge*, 140 Mich. 236, 112 Am. St. Rep. 399, 103 N. W. 597;
*Howell* v. *Anderson*, 66 Neb. 575, 61 L. R. A. 313, 92 N. W.
760.)

At the common law of England the rule with refer-
ence to executors was not universally the same, since at law
the naming of a person as executor discharged a debt which

the executor owed his testator. (See *Wankford* v. *Wankford*, 1 Salk. 300, 91 Eng. Rep. 265; *Winship* v. *Bass,* 12 Mass. 199; *Gardner* v. *Miller,* 19 Johns. (N. Y.) 188; *Marvin* v. *Stone,* 2 Cow. (N. Y.) 781; *Soverhill* v. *Suydam,* 2 T. & C. 460, 59 N. Y. 140; *Mason's Estate,* 42 Or. 177, 95 Am. St. Rep. 734, 70 Pac. 507; *Crow* v. *Conant,* 90 Mich. 247, 30 Am. St. Rep. 427, 51 N. W. 450; *Judge of Probate* v. *Sulloway,* 68 N. H. 511, 73 Am. St. Rep. 619, 49 L. R. A. 347, 44 Atl. 720.) That the common law of England obtained in this country until changed by statute is the holding of all the last-cited authorities, with the exception of the English case of *Wankford* v. *Wankford.*

Many of the states have expressly abrogated by statute the common-law rule that an executor is discharged from his debt by the naming of him as executor. (See *Kealhofer* v. *Emmert,* 79 Md. 248, 29 Atl. 68; *Warner* v. *Knower, supra; Mason's Estate, supra;* section 1447, Cal. Code Civ. Proc.) The California statute is identical with section 10133, *supra.* New York's provision has no appreciable distinguishing feature. Other states have similar legislation, but these references are sufficient to illustrate the general situation.

It is at least of interest to notice that, while some of the commentators say that the rule to the effect that the naming of a person as executor does not discharge him from his debts to the testator has been adopted in Massachusetts without the intervention of a statute, the court in the case of *Winship* v. *Bass, supra,* bases its conclusions upon the provincial statute of 1703, which it holds abolished all distinctions between executors and administrators. The ruling was that an executor was liable for a debt due from him personally to his testator as for such money in his hands. The court also points out that the earlier Act was continued with some amplifications by an Act of the state legislative body after the colonies had become independent.

It should also be borne in mind that, while at law, prior to the statutory enactments, an executor was discharged, in

equity, even in England, creditors could always require an executor to subject his assets to the payment of the debts of the testator, and in some instances the legatees could compel the payment of the debt. (See *Wankford* v. *Wankford, supra; Gardner* v. *Miller, supra; Marvin* v. *Stone, supra; Judge of Probate* v. *Sulloway, supra; Crow* v. *Conant, supra.*) Except as the liability rule was affected by the discharge rule, there was no distinction made between executors and administrators.

In Massachusetts, as has been observed, the courts have generally adhered to the legal fiction that the appointment of a man as representative of a decedent who was indebted to the decedent operated to transmute the debt into cash in the hands of the representative. This rule and the reasons therefor are stated by the court in *Kinney* v. *Ensign,* 35 Mass. (18 Pick.) 232, as follows: "He is held to account for it as a debt paid, from convenience and necessity, because the administrator cannot sue himself, and cannot collect his own debt in any other mode than by crediting it in his administration account. On technical grounds, as well as on considerations of policy, an administrator is not permitted to show that he could not collect a debt due from himself."

Nevertheless, even in Massachusetts, the courts have found it necessary to abandon the rule in instances. The last case cited (*Kinney* v. *Ensign*) is an example of this. There the court was asked to apply the rule consistently, following their "fiction" that the appointment of the executor operated as payment of the debt and to hold that this payment effected a discharge of security for the payment of the debt. The court refused to do so, and in coming to its conclusion said: "Such a legal fiction will never be allowed to go so far as to work wrong and injustice." On the other hand, the courts which have applied the majority rule have apparently been consistent in their rulings.

New York, by affirming a judgment in favor of the sureties upon the bond of an executor, who, because of insolvency

at the time of appointment by the court, was unable as executor to pay to the claimants the amount of a debt which he personally owed his testator, in effect applied the rule that, where such condition was not occasioned by the fault of the executor, there was no liability, except to turn over the debt as a continuing personal liability. (See *Baucus* v. *Barr,* 107 N. Y. 624, 13 N. E. 939.) While this is a memorandum decision, it arose out of the facts discussed in *Baucus* v. *Stover,* 89 N. Y. 1. In the last-cited case the court had directed the surrogate to specify the charge ''separately, so as to save all the rights of the executor and to protect him against consequences which perhaps ought not to follow from such a charge.'' The effect of these holdings is to rule that the appointment of a debtor executor does not operate to create a liability of the executor toward his personal indebtedness which is any greater than the liability arising from any other asset which has come to the executor's hands; it does not operate as a payment and compel the treatment of the amount of the debt as cash for all purposes.

In the same jurisdiction it has been held that the security for the payment, which was in existence at the time of the executor's appointment by the court, is not released by the appointment. (*Soverhill* v. *Suydam,* 2 T. & C. 460, 59 N. Y. 140.)

In *Warner* v. *Knower, supra,* the New York court also held that the appointment of the debtor as executor did not operate to terminate the accrual of interest upon the personal debt. If the strict rule of Massachusetts were applied, the conclusion of the court in this last-cited case would have been incorrect. In the opinion in this case the court concluded that the only effect of their statute was to abrogate the common-law rule of discharge by naming a debtor executor. After discussing the cases of *Baucus* v. *Stover* and *Soverhill* v. *Suydam,* it said: ''The two cases just cited clearly establish that the statute * * * must not receive a strict and literal interpretation. * * * That the legislature, by its enactment of the

statutory provision, * * * did not intend to effect the result
that the learned referee thinks it has accomplished, is dis-
covered, also, by an examination of the notes of the revisors.
'The debt of an executor,' they say (3 R. S. [2d ed.], 640),
'is now liable to creditors, and in some cases to legatees;
but, when not required for these purposes, it is discharged
or belongs to the executors, and is not to be distributed among
the next of kin, unless it appear, on the face of the will, that
the testator did not intend to discharge the debt. Few per-
sons are aware of this; and, as well to avoid the disputes that
arise, as to establish what is believed to be a just rule, this
section is copied substantially from the laws of Maryland.
* * * ' It was the avowed object of the provisions in the
Maryland law to abrogate the old doctrine, whereby the bare
appointment of an executor worked an extinguishment of his
indebtedness to his testator, and to furnish a simple method
of making such indebtedness available as an asset of the es-
tate.'' The court concluded that the executor was liable for
the interest.

It is undoubtedly the rule in Maryland that an executor is
not liable, as for such money, on indebtedness which he per-
sonally owed his testator, if he is unable to pay it during his
administration. (See *Kealhofer* v. *Emmert, supra,* and *Linthi-
cum* v. *Polk,* 93 Md. 84, 48 Atl. 842.)

In California a very peculiar situation exists as a result of
the decisions in the cases of *Treweek* v. *Howard,* 105 Cal. 434,
39 Pac. 20, and *In re Walker's Estate, supra.* In the case
of *Treweek* v. *Howard* the court held the bondsmen of an
executor liable for the amount of a debt owed by an executor
to his testator, regardless of the ability of the executor to
meet it. In the case *In re Walker's Estate* it directed
the lower court to do the same thing the New York court
had directed the surrogate to do in *Baucus* v. *Stover,* namely,
to segregate the amount of the debt from the actual cash. The
*Walker Case* involved the actions of the lower court at the
hearing upon the settlement of the accounts of an adminis-

trator, who claimed he was insolvent. Upon the appeal by
the administrator, the court was asked by the respondent
to apply the rule of the case of *Treweek* v. *Howard* to the
*Walker Case*. This the court declined to do, saying: "That
decision was based upon the estoppel of the decree and upon
section 1447 of the Code of Civil Procedure. * * * That
decision may be justified by the estoppel of the decree. The
question is not so presented here. So far as it is based upon
the statute, it is apparently in conflict with the cases in New
York, construing the statute from which our Code provisions
are taken. This is, however, not the case of an executor.
The Code lays down no such rule in regard to administrators.
They are still left under the common-law rule, under which
* * * the debt due the estate from an insolvent adminis-
trator is not for all purposes regarded as money on hand,
but is so regarded only by a fiction of law which can only sub-
sist with justice." We have already pointed out that the
section 1447 referred to is identical with our section 10133,
*supra*. What the supreme court of California would say upon
the precise question in the case of an insolvent executor, if
it were presented unaccompanied by any estoppel compli-
cation, we cannot foresee.

It might be well to examine our own statutes in an effort
to learn whether we can arrive at their meaning, considering
them alone and without the aid of the precedents from other
states.

The language of section 10133 as to the liability of the
executor respecting his own debt to his testator clearly states
a comparative rule of liability, which is that he is liable for
the same "as for" money in his hands. In other words, if
we can find what an executor's liability is toward the cash
he has received as executor, then we find the extent of his
liability as executor arising out of his own debt to the de-
cedent. It is noticeable that this section does not require that
the inventory show the debt as cash. It says: "But the *claim*
must be included in the inventory."

[73 Mont. 35.]

We take it to be the rule that an executor is not always liable for loss in the amount of cash on hand. Suppose as soon as an executor receives the cash he hastens to deposit it in a safe place for keeping—suppose he goes from his office to a bank for the purpose of depositing the cash, taking all reasonable precautions, and is "held up" and the cash is stolen from him. Would any court say that he was liable for such loss, occurring without his fault? We think not. Undoubtedly section 10283 would protect him. This section provides: "He shall not * * * suffer loss by the decrease or destruction, without his fault, of any part of the estate."

Or assume that the money was deposited on trust account in a bank, concerning the soundness, solvency and stability of which there had never been a question, and as to the soundness of which a cautious business man could not have learned anything in the ways which are open to depositors, which would have put him on guard, but, notwithstanding, the bank failed before the estate was closed, would the executor be liable? The rule of section 10283 should likewise protect the executor in such an instance. (See 11 R. C. L., p. 150, sec. 159.)

To take another example: Assume a case of an estate consisting entirely of tangible personal property, such as sheep, how is the executor's liability determined? Section 10282 provides that an executor or administrator is chargeable in his account with the whole of the estate "at the value of the appraisement contained in the inventory, except as provided" by other sections, especially section 10283. If upon an accounting there has been a loss which is the result of the representative's fault, the court charges such loss to him and he becomes liable as for such money as the court finds the estate has lost. True, the statute does not so provide in terms. There cannot, however, be any question but that such is the net result. By the decree or order settling an account, the court fixes the amount of the representative liability. If upon a final distribution of the estate the assets be intact, together with "interest, profit, and income," the representative is dis-

charged upon his turning over to the persons entitled thereto the same assets he received, or, in the event the assets which he received were debts due the decedent and the debts were collectible, the cash which he has collected. If there should be property which is not on hand, the representative is required to deliver the value thereof in cash in lieu of the property, unless the court has allowed credit for the lost property as having been "decreased or destroyed" without the fault of the executor or administrator. The result of this is that in any event the executor is liable as for "such money"; that is, the money representing the value of the property, if he cannot deliver the specific property.

Throughout the discussion of this question an effort has been made to always distinguish between the liability of a representative which is incident to or resulting from his trust duties and the personal liability which was or is present without regard to the trust. We are inclined to think that the confusion which has arisen over the character of question we are considering is due to the failure to make that very distinction. Speaking very broadly, it is only the duty of an executor or administrator to honestly and with due diligence preserve such estate as a decedent dies seised or possessed of, for distribution to creditors, devisees, legatees and next of kin. When this has been accomplished, the trust has been fulfilled. If the representative has failed in this purpose, either partially or wholly, there is a *pro tanto* liability which he or his bondsmen must meet; and to this end bonds are always required upon the appointment of an administrator. The court must also require bonds of an executor in all cases where the request has not been made by the testator that no bonds be required, and, in any case where the court deems it necessary, it may require them. It is not for the purpose of creating something where there was nothing that estates are administered, however. With very few exceptions, it is a breach of trust to do other than to keep an estate intact. It is not contemplated that by or in the process of probate

the value of estates is to be enhanced. All well and good, if such be the case, but the representative who undertakes to handle the assets for profit to the estate—and certainly all profits realized from any operations with or investment of estate assets inure to the benefit of the estate—does so at his peril.

It is our conclusion that our section 10133, *supra,* was enacted for the sole purpose of changing the common-law rule as to executor debtors and to make certain that the common-law rule controlling administrators and other trustees, whereby the assets would be available to the persons entitled thereto, would be applied to executors.

We know of no statutory rules, except section 10133 and the statutes touching the powers of executors to do the things specified in the will where there were such testamentary directions, which make any distinction between administrators and executors. Possibly it might be said that the provisions of section 10131, Revised Codes of 1921, permit the appraisement of a debt due from an administrator to his decedent at a smaller amount than the face of the debt. If that were the only provision on the subject, there might be room to advance such an argument. However, the provisions of section 10135 must be read with section 10131. That section provides: "The inventory must be signed by the appraisers, and the executor or administrator must take and subscribe an oath before an officer authorized to administer oaths, that the inventory contains a true statement of all the estate of the decedent which has come to his knowledge and possession, and particularly of all money belonging to the decedent, and of all just claims of the decedent against the affiant. The oath must be indorsed upon or annexed to the inventory." No distinction is made by that section. "All just claims" of the decedent against the representative must be included in the inventory, whether the representative be an executor or an administrator. There is, on principle, no distinction between executors and administrators in this respect, once it is admitted that a person

who is named executor is not discharged from his personal debt to his testator. (See note following the case of *Wachsmuth* v. *Penn Life Ins. Co.*, as the case is reported in 132 Am. St. Rep. 226, which quotes from Ross on Probate Law and Practice, 423–426.)

While it is true that in this state the rule of statutory construction is that "the rule of the common law that statutes in derogation thereof are to be strictly construed has no application to the Codes or other statutes of the state of Montana" (sec. 4, Rev. Codes 1921), yet by section 10703, *Id.*, it is provided: "In this state there is no common law in any case where the law is declared by the Code or the statute; but where not so declared, if the same is applicable and of a general nature, and not in co:. 'lict with the Code or other statutes, the common law shall be the law and rule of decision." Clearly there is no statute in conflict with the common-law rule, holding the administrator liable to the same extent as an executor in connection with his own debt due a decedent. Whatever legislation there is upon the subject is entirely in keeping with the application of the same rule to both. Further than this, every reason which underlies the application of such a rule to executors would lead to the same result in the case of an administrator. An administrator can no more sue himself than can an executor. The nature of the trust is to all intents and purposes identical. It is to preserve the property for the persons entitled thereto.

We are convinced that the provision of the section respecting the liability of an executor toward his own debt, "as for such money in his hands," accomplishes no more than to provide that executors shall be held liable to the same extent administrators are for their personal indebtedness to their decedents, and that the "money in hand" rule is not a rule affecting the liability upon the debt, but is a rule governing the method of accounting for the debt and establishing the extent of the liability of the representative. This is nothing more nor less than a rule which permits and requires the

court, in the exercise of its probate jurisdiction, to adjudicate as to the existence or nonexistence of the debt without it being necessary to bring suit upon such debt. Since the representative cannot sue himself, in effect, by the listing of the debt in the inventory, he confesses a judgment against himself. If he fails or refuses to list the debt, he can be compelled to do so, and thus the personal liability becomes fixed for the amount thereof. If at any time during the course of the administration he is able to actually turn the debt, or any portion thereof, into cash, it is his duty as the representative to do so. The converse of the rule, which is expressed in section 10284, Revised Codes of 1921, as follows: "No executor or administrator is accountable for any debts due the decedent, if it appears that they remain uncollected without his fault," would operate to subject him to liability, since it would be his fault if his own debt was uncollected by him as representative. If, on the other hand, it appeared that the representative had nothing from which the cash could be realized to meet the debt, he should not be held liable in his representative capacity. Following this proposition one step further, we would say that if the representative, who was in the position of a debtor to his decedent, did everything he could to secure for the estate the money which was due upon his indebtedness, but was unable without his fault to turn over the full amount, he would not be liable as representative for the difference. But to repeat, with reference to any indebtedness owing to a decedent, it is the executor's or administrator's duty to collect when it becomes due, and if he fails to do what he is bound to do, and the estate suffers loss thereby, he is liable for such loss. Being chargeable with the debt as inventoried, and being in duty bound to inventory it, the burden is upon the representative who seeks to escape the liability to turn over the amount thereof in cash, to show that his inability to do so is not the result of his own negligence; and, by reason of the fiduciary relationship which exists in such a case, the representative should

be required to make a clear showing that his relationship has not caused the loss. When a sufficient showing has been made, however, to warrant the court in finding that the representative can fulfill all the duties of his trust by turning over the unpaid portion of his personal debt in lieu of cash, this does not relieve him from the indebtedness. It is merely an adjudication that he has in his hands, as executor, all that the law requires him to have; that he has honestly and with due diligence protected the estate from loss and is in a position to turn over to his *cestuis que trust* the property to which they are entitled, including a continuing personal liability for the unpaid portion of the debt which he owed his decedent. No liability has been added. Nothing has been lost by reason of the administration.

Both on precedent and on our own construction of the statutes of this state, we are of the opinion that the sound rule is that which holds that the executor as well as the administrator, who was also a debtor to his decedent at the time of death, is not liable, where, after meeting the burden which is upon him to account for all assets, he shows that he has not been guilty of neglect toward any asset and is in a position to turn over all of the estate which he received when he assumed the trust, including such cash as he could with due diligence recover upon his own and all other debts due his decedent, together with such of his own and other indebtedness as he had not been able to recover for the estate during his administration. It is probably unnecessary to do so, but as a precaution it may be best to add that, where credit has been allowed for any loss or authorized deduction, the representative is not liable to turn over any amounts for which he is entitled to credit.

In this connection we call attention to the fact that an executor or administrator is never entitled to absolute and final credit, as that term is generally used, when he is unable to collect his own debt or the debt of any one else for the benefit of the interested persons. The only release which

he can ask is that of release from liability for negligence, which is *prima facie* attendant in case of failure to collect in every instance where, upon the settlement of the final account, no showing is made why the cash which the representative or others owed a decedent is not present for distribution. Where such showing of absence of fault is made, however, the representative is entitled to a finding to that effect. And it should certainly be pointed out that, where there has been an excusable failure to collect any debt, the debt is not extinguished, whether it be the representative's personal one or another's. Therefore, whenever that is the case, the court should follow the practice indicated in *Baucus* v. *Stover* and *In re Walker's Estate, supra,* and show the actual conditions.

At this point we will take up the *Rodgers' Estate* decision, which we have heretofore referred to. Because of the possibility of misconstruing the holding of that case, as counsel for respondents herein have done, we deem it advisable to discuss the facts of the case in the light of what we are now saying. As it bears upon the question we have been considering, the only feature of the *Rodgers' Estate* as presented to this court which is pertinent is the one of the interest upon the executor's indebtedness. The lower court therein had refused to charge the executor with any interest upon his personal indebtedness to the estate. It should be borne in mind that the record there disclosed that the executor was for some time after his appointment amply able to have paid the full amount of his indebtedness. Such having been the case, there is not the slightest doubt as to the correctness of the conclusions reached by this court in that phase of the *Rodgers' Estate*. As has been heretofore stated, both executors and administrators are liable in their representative capacities "as for such money" in their hands upon the amount of admitted indebtedness due from them to their decedents when it appears, as it did in that case, that they were personally possessed of assets from the proceeds of which they can actually realize the cash which they owe to the estate. If the executor therein had sought

to escape liability for failure to collect the balance of the principal sum which he owed the estate, the court would have been compelled to deny him any relief. The basis of the liability would have been the negligence of the executor in failing to preserve the assets of the estate, and, as a part of the indebtedness was the interest which the law allowed on the principal sum, it was likewise negligence on his part to fail to collect that sum from himself. There is no conflict between the rule of the *Rodgers' Estate* and the one we have announced herein. The discussion of the "money in hand" rule therein was clearly applying what we have termed the "comparative rule" of representative liability.

We also think it best to say here that the language used in the decision of *In re Eakins' Estate,* 64 Mont. 84, 208 Pac. 956, as to the burden of proof upon the settlement of accounts of executors and administrators, is not in conflict with our present views. We have been discussing herein a situation which in our opinion establishes a rule of *prima facie* liability "as for such money" in hand. While we have concluded that the application of this rule does not in all cases hold the individual liable in his representative capacity for failure to pay a debt due from him to the estate, still the burden is upon him to show facts from which the court can say that the persons entitled to take the assets have not suffered loss by reason of his failure as representative to collect his personal debt. The burden is always upon a representative who seeks to avoid a liability which the law places upon him, as where he is chargeable with the amount of the inventory, and asks credit for deductions from that amount or seeks exoneration from liability for failure to collect. *In re Eakins' Estate* does not hold to the contrary.

It now remains to be ascertained how the rule should be applied in the case at bar. The order of the lower court herein touching this question is as follows: "It is further ordered and decreed that the said executor, Frank A. Flanagan, be and he is hereby charged in said annual account as

and for so much money in his hands, the several sums for which he appears to be liable to said estate hereinbefore referred to." In the recitals or findings of the order referred to, there appears, after mention of Mr. Flanagan's notes, the following: "That the said executor, Frank A. Flanagan, was and is liable to said estate upon said promissory notes as and for so much money in his hands when the said promissory notes became due and that he has neither charged himself as such executor with such moneys in his hands in the inventory in this estate, nor in said account, nor has he turned the said moneys over to said estate." It is therefore quite evident that it was intended by the order to require the executor to turn to the estate the full amount of cash to meet this indebtedness.

It should be here noted that, while the amount of the Flanagan notes was not segregated, the affidavits in support of the motion for a new trial set out the items going to make up the total, and, if these affidavits be true, then the amount was included in and as a part of the item of the inventory, "Notes secured and unsecured $42,556." Considerable stress was laid by the respondents upon the proposition that the form of the inventory did not conform to the requirements of section 10131, Revised Codes of 1921, relative to the listing of the debts. It is true that the inventory was faulty in this regard, but that fact did not justify the court in charging Mr. Flanagan with something which there is a possibility he was not legally chargeable with. The court had by the provisions of section 10124 *et seq.* ample means for the protection of the estate; and it must be added that the Code provisions clearly require that a representative have notice of all steps which are sought to be taken against him, with the exception of suspension pending a hearing upon the question of removal. If, then, the inventory was not such a one as is required by law, the remedy is either to require the making and return of one which is sufficient, or removal. Upon such steps being taken, that is resulting in removal, by the pro-

visions of section 10295 the court can still compel an accounting and fix the extent of the representative's liability.

To revert to the specific question of the liability of a representative concerning his personal indebtedness to his decedent, in the event he did not return the amount of the debt in the inventory, certainly the representative and his bondsmen, if any, would be liable for any loss resulting from such failure to inventory the claim, and would be chargeable upon the accounting pursuant to the provisions of section 10295, *supra*.

The record before us shows a decided lack of attention to the statutory requirements relative to probate procedure. It is almost, if not quite impossible, to arrive at any idea as to the exact condition of the estate. For instance, in the accounts filed there is no attempt made to arrive at the amount with which the executors are chargeable. Possibly this is due to a misunderstanding of the rule announced in the case *In re Davis' Estate,* 31 Mont. 421, 78 Pac. 704. This case is generally cited as holding that in intermediate accounts it is only necessary to show receipts and disbursements of money. Such is not the holding of the case. It was urged that the account there under consideration did not charge the representative with the appraised value of the estate. There is language used, which, if the facts of the case were not considered, might lead to the conclusion that it was never necessary to show anything but the cash transactions. The record in the case, however, shows that the account which was under consideration, and which was what is sometimes called an annual account, opened with a charge of balance as per last account, or words to that effect. Thereupon the transactions subsequent to the account from which the balance was taken were detailed. Where the extent of the liability upon a former account has been fixed, it is not necessary to revert to the inventory. Clearly, however, the account should in the first instance charge the representative with the total of the values as shown in the inventory. It should be in such shape that

the court could tell the exact amount of the contingent liabilities of the representative. And by ''contingent'' we mean that, if upon his final account he is able to turn over the estate intact after deducting allowable credits, the liability disappears; that is to say, the account should disclose the condition of the estate by a system of charges and credits claimed, or by any other system which will give the information.

On the settlement of any account it should be possible from the account and any testimony adduced in support thereof or opposition thereto for the court accurately to arrive at a determination of the question whether or not the purpose of the administration is being accomplished; that is, whether or not the assets are being preserved for the persons entitled thereto. It should always be borne in mind that by sections 7040 and 7072, Revised Codes of 1921, the title to the property, subject only to the control of the district court and the possession of the representative for purposes of administration, passed to the devisees, legatees, or heirs at the time of a decedent's death. (See *Lamont* v. *Vinger, supra.*) By some system calculated to accomplish the end, every account should advise the court as to what of the inventoried assets are on hand and what has been done with those which are not on hand.

We must revert to the application of the specific rule as to the executor's liability concerning his personal indebtedness to testators to the case at bar. It is utterly impossible for this court, from the information which is before it, to ascertain what the result should be from the application of the rule. We cannot tell whether Mr. Flanagan did what he could to preserve for distribution the cash which his duty as executor required of him toward his own and all other debts, or not. If it were not for the very complex nature of the proceedings in the lower court, we take it that, since in our opinion the burden is on the representative who seeks exoneration for losses on the ground that they are not caused by his own negligence or fault to show such to be the fact, Mr. Flanagan

73 Mont.—5

would not be in a position to urge the question upon this appeal. However, the record discloses that the application of the "money in hand" rule was asked by the respondents herein for the first time after hearing upon the account, and while the matter was reposing with the court for ruling, by the motion asking leave to amend their objections. Without any ruling upon this motion, the granting of which would have reopened the hearing upon the account, the lower court proceeded to make its order applying the rule. It also appears that the account on which the hearing was had was not filed as a final account. At that time, therefore, it was not necessarily incumbent upon Mr. Flanagan to assume this burden. Certainly with reference to the amounts which had been paid by Mr. Flanagan, the result was erroneous. Following the order, Mr. Flanagan moved for a new trial on the grounds of surprise, as well as error. This motion was denied. The lower court also erred in not permitting Mr. Flanagan to show the entire status of the case. As has been stated, we have no facts before us upon which we can arrive at any opinion as to whether Mr. Flanagan was at fault. We do, however, point out that upon the next hearing the lower court should bear in mind the "money in hand" rule as we have endeavored to express it.

There remain to be commented upon two other propositions. [14] The appellants contend that, by their actions, and in particular by the actions of Mrs. Connolly, the respondents have estopped themselves to assert the propositions which they contend for.

We do not feel that, if this were the only question presented, the record would warrant us in applying such a rule, even though it is possible to apply the doctrine of estoppel to a set of facts occurring in probate. As to whether it is ever possible to so apply any phase of the doctrine, we express no opinion. We do say, however, that it would certainly have to appear that every person interested would have to be bound thereby before a court could relieve a representative from

liability to every one by reason of the existence of any facts which might warrant its application.

The remaining question is as to the payment to the attorney, [15] credit for which was disallowed. Here again we are not in a position to express any final opinion. It would, however, be a very extreme case where the executors were not entitled to credit in some amount for the payment to an attorney who had represented them. As to whether the services performed by Mr. Miller herein were worth the amount paid, we cannot say. The attorney was offered as a witness to testify, both generally and as to the services he had performed. It might have appeared that the services were of little value. A court cannot, however, justify its rulings by taking into consideration matters which are known without the record. If there are facts which are known to the court which properly affect its decision, they must be placed of record, so that this court can judge whether they are sufficient to base a legal conclusion upon; and the executors were entitled to make the showing which they offered to make. The disallowance of this item was, at least upon the record before us, erroneous and prejudicial.

The order settling the account is reversed, and the matter is remanded to the lower court, with directions to require of F. A. Flanagan and the representative of Catherine Connolly full and complete accounts and reports of their administration of the estate of the decedent, and to proceed with the hearing thereon as provided by law, and in conformity with the views herein expressed.

The appeal of H. F. Miller is dismissed.

*Reversed and remanded.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES HOLLOWAY, STARK and MATTHEWS concur.